***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Hoag. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Opinion and Award of Deputy Commissioner Stephenson.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. At all relevant times, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At all relevant times, an employee/employer relationship existed between the plaintiff-employee and defendant- employer.
3. The North Carolina League of Municipalities was the compensation carrier on the risk.
4. Plaintiff's average weekly wage was $575.00.
The last date that plaintiff worked for defendant-employer was July 30, 1998.
The following exhibits were entered into the evidence of record at the hearing before the Deputy Commissioner:
Plaintiff's Exhibit 1- discrimination complaint
Plaintiff's Exhibit 2- EEOC document
Plaintiff's Exhibit 3- statement of charge
Plaintiff's Exhibit 4- Privacy Act Statement
Plaintiff's Exhibit 5- notes of meeting July 17, 1998
Plaintiff's Exhibit 6- notes of meeting July 20, 1998
Plaintiff's Exhibit 7- notes from Chief Keen (entered into evidence and then ruling rescinded.)
Plaintiff's Exhibit 8- letter dated September 28, 1998
Plaintiff's Exhibit 9- doctor's note
Plaintiff's Exhibit 10- letter from Mr. Lucas October 6, 1998
Plaintiff's Exhibit 11- letter
Plaintiff's Exhibit 12- letter October 21, 1998
Plaintiff's Exhibit 13- letter October 29, 1998
Plaintiff's Exhibit 14- letter November 20, 1998
Plaintiff's Exhibit 15- letter December 7, 1998
Plaintiff's Exhibit 16- letter December 10, 1998
Plaintiff's Exhibit 17- letter of termination
Plaintiff's Exhibit 18- grievance complaint
Plaintiff's Exhibit 19- letter
Plaintiff's Exhibit 20- insurance cancellation
Plaintiff's Exhibit 21- employment list
Plaintiff's Exhibit 22- training record
Plaintiff's Exhibit 23- list of returned equipment
Plaintiff's Exhibit 24- copy of restructuring plan
Defendants' Exhibit 1- report/study of Clayton
The issues before the Commission are whether plaintiff suffered from an occupational disease as defined by N.C. Gen. Stat. §97-53 (13), and if so, to what benefits is she entitled.
 ***********
Based upon all of the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
Plaintiff was forty years old at the time of the hearing before the Deputy Commissioner and began her employment with defendant — employer on March 6, 1982 as a full-time dispatcher and part-time reserve police officer. In 1984, plaintiff was transferred to a full-time police officer position and continued in this position until July 1998.
In December 1990, plaintiff became a DARE officer. Plaintiff's new duties required her to teach school children to resist drugs and violence.
Sometime prior to May 1997, the Town Council contracted for an outside management study to evaluate the operations of the Clayton Police Department. As a result, several recommendations were made regarding reorganization in terms of the command structure within the department.
On December 30, 1997 a departmental meeting was held in order to present the reorganization plan to Police Department personnel prior to submission of the plan to the Town Council. The purpose of the meeting was to make sure the officers had all the information and knew the goals of the plan.
The purpose behind the plan was to clearly delineate the communication structure within the department, so each position was analyzed as to its reporting responsibility. The main thrust of the restructuring plan was to go from an organization where defendants had a chief and one (1) lieutenant, to an organization where there was a chief and two (2) lieutenants, both of whom would be over specifically named divisions with responsibility for operation of those divisions.
As part of the reorganization plan, the DARE program in which plaintiff worked was assigned to be part of the Investigations Division, which was to be under the supervision of Lieutenant Weaver. Prior to the reorganization plan, plaintiff reported directly to Chief Keen.
The reorganization plan affected the entire Police Department.
Plaintiff was not demoted in any way and she did not receive any decrease in her salary or other benefits.
No evidence of record showed that plaintiff was singled out during the September 30, 1997 meeting or in the reorganization plan itself.
After the changes in the Department were implemented, the position for the new lieutenant was advertised both internally and in local newspapers. Plaintiff completed an application for the position but withdrew her application before it was considered because she no longer wanted the position. In April 1998 the position was filled.
On May 10, 1998, while performing her normal job duties while standing in front of a class giving a lecture, plaintiff began experiencing chest pains.
Plaintiff was treated by Dr. Joan Meehan for her complaints, and all tests were negative. Dr. Meehan found plaintiff to be a heavy smoker with a high caffeine intake. Plaintiff was treated for fluid around her heart with medication.
Plaintiff did not attribute any of her complaints to her job, although she told Dr. Meehan that she was concerned about having a job once Chief Keen retired at the end of the year.
Dr. Meehan first treated plaintiff in January 1990 and testified that prior to June of 1998, plaintiff had no disabling medical conditions. Dr. Meehan felt from the summer to the end of 1998, plaintiff developed severe anxiety and depression.
Dr. Meehan recommended plaintiff see a psychiatrist. Dr. Meehan felt plaintiff's stress and anxiety were related to her job with defendants.
The new lieutenant, Jerry Shoe, began working for the department in July 1998. Shortly thereafter a reporter for the local newspaper approached Town Manager Steve Biggs and relayed concerns about the Police Department.
Specifically, the reporter confided to Mr. Biggs that she had been approached by Lieutenant Weaver and plaintiff regarding Lieutenant Shoe's driving record.
Without authorization an unnamed individual had utilized the SBI computer and pulled Lieutenant Shoe's driving record and provided it to the newspaper. After receiving this information from the reporter, Mr. Biggs met with plaintiff, Chief Keen and Amy Alford, Personnel Officer, to discuss plaintiff's knowledge of and involvement with the dissemination of the information from the SBI computer to the local media.
The meeting was held on July 20, 1998. Plaintiff was not the only person with whom Mr. Biggs met to discuss the dissemination of the information, as other officers were interviewed about the investigation.
The meeting lasted less than ten minutes and plaintiff was allowed to leave the meeting at her will. During the course of the meeting plaintiff denied having any media contact with regard to the information about Lt. Shoe, but acknowledged that she possessed the information because a note was put under her door. Plaintiff admitted she discussed the information with someone else, but denied she forwarded the information to the newspaper. The meeting became somewhat hostile and ended.
On July 30, 1998 while she was performing her normal job duties, plaintiff began to feel sick again and thought she was having a heart attack. Nothing out of the ordinary happened at work that day, and plaintiff had no idea what specifically caused her symptoms.
Plaintiff last worked for defendants on July 30, 1998.
Plaintiff's claim for the contraction of an occupational disease was denied by defendants.
Plaintiff was terminated from employment with defendants on December 14, 1998 for her failure to return to work upon exhaustion of her sick leave.
Dr. Thomas Gualitieri performed an independent medical examination on plaintiff on April 17, 2000. Dr. Gualitieri diagnosed plaintiff with post-traumatic stress disorder and major depression.
Dr. Gualitieri felt plaintiff's medical condition was related to her employment with defendants and did not believe plaintiff had a personality disorder. He described her as a perfectionist and felt she would be particularly sensitive to changes in routine or structure.
Dr. Dan R. Chartier performed an independent medical examination on plaintiff in October of 2001. Dr. Chartier diagnosed plaintiff with substantial psychological distress and felt plaintiff could not return to the work environment with defendants.
Dr. Chartier felt plaintiff's symptoms were caused by bad managerial treatment at her work environment. He based this opinion on the history he obtained from plaintiff.
Dr. Chartier recommended plaintiff continue in psychological counseling and psychotherapy.
Dr. Chartier did not feel plaintiff had post-traumatic stress disorder, as that is a diagnosis he reserved for persons who went through a life-threatening trauma. Dr. Chartier felt plaintiff was more sensitive to changes than other individuals.
The Full Commission finds that there is insufficient evidence of record to support a finding that plaintiff's stress disorder was characteristic of her trade or occupation, or that her condition was not an ordinary disease of life to which the public was equally exposed outside of her employment.
The Full Commission finds that plaintiff was not exposed to an increased risk of contracting the stress disorder as compared with members of the public not so employed. The record contains no medical testimony that plaintiff was at an increased risk of contracting her disease than members of the general public.
 ***********
The foregoing findings of fact, and conclusion of law the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Compensation under the North Carolina Workers' Compensation Act may be awarded for an occupational disease pursuant to N.C. Gen. Stat. §97-53(13) if two conditions are met: (1) it must be "proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment"; and (2) it cannot be an "ordinary disease of life to which the general public is equally exposed outside of the employment." Booker v. Medical Center, 297 N.C. 458, 468,256 S.E.2d 189, 196 (1979). The claimant bears the burden of proving the existence of an occupational disease. Gay v. J.P. Stevens Co.,79 N.C. App. 324, 331, 339 S.E.2d 490, 494 (1986).
2. Plaintiff has not shown that her disease is characteristic of persons engaged her particular trade or occupation. Testimony presented did not establish that plaintiff's job as a D.A.R.E. officer was especially stressful or life threatening. Plaintiff did not establish that her disease was not an ordinary disease of life to which the public generally is equally exposed. Norris vs. Drexel Heritage Furnishings,Inc., 139 N.C. App. 620, 534 S.E.2d 259 (2000). Plaintiff suffered from stress and anxiety that was the result of contact with a superior. Plaintiff did not establish through medical testimony that her conflict with her superior was unique or characteristic to her profession.
3. Plaintiff has not established that she has contracted an occupational disease as defined by N.C. Gen. Stat. § 97-53(13). Plaintiff is, therefore, not entitled to compensation under the provisions of the North Carolina Workers' Compensation Act. Id.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Under the law, plaintiff's claim must be, and is hereby DENIED.
2. Each side shall pay its own costs.
This the 18th day of December 2003.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER
LKM/kjd